**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**KRISTIN MELISSA MOFFAT,**

> **Plaintiff,**

**v.**                                                    **CIVIL ACTION NO. 3:21-CV-129**
                                                          **(JUDGE GROH)**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

> **Defendant.**

## REPORT AND RECOMMENDATION

This case arises from the denial of Plaintiff Kristin Melissa Moffat's ("Plaintiff") Title II application for a period of disability and disability insurance benefits ("DIB"). After Plaintiff's application proceeded through a lengthy administrative process, including multiple remands by the Appeals Council, a United States Administrative Law Judge ("ALJ"), concluded that Plaintiff was not disabled within the meaning of the Social Security Act. Plaintiff's most recent request for review by the Appeals Council was denied, making the ALJ's decision the final decision of Defendant Kilolo Kijakazi, the Commissioner of Social Security, ("Defendant" or "Commissioner"). Now, Plaintiff seeks judicial review of the Commissioner's decision.

Because the Commissioner's final decision to deny Plaintiff's claim for DIB is supported by substantial evidence, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge recommending the Plaintiff's Motion for Summary Judgment, ECF No. 19, be **DENIED**, and the Defendant's Motion for Summary Judgment, ECF No. 23, be **GRANTED**.

## I.    **PROCEDURAL HISTORY**

On March 11, 2016, Plaintiff Kristin Melissa Moffat ("Plaintiff") filed a claim for DIB, with an alleged onset date of disability of November 4, 2015. R. 16. Plaintiff's application for DIB was initially denied on March 11, 2016, and upon reconsideration on November 16, 2016. R. 16, 132-156. After the denials, on December 7, 2016, Plaintiff requested a hearing before an ALJ. R. 16. On December 6, 2018, a hearing was held before ALJ Jeffrey P. LaVicka. *Id*. On January 8, 2019, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act. R. 105-131, 157-177.

On September 9, 2019, the Appeals Council vacated and remanded the case to ALJ LaVicka, finding that the prior unfavorable decision did not address evidence in claimant's testimony and evidence in the treatment notes which indicated that claimant's medications were not effective, resulting in her undergoing ECT treatments for depression. R. 16, 178-182.

On February 25, 2020, ALJ LaVicka held a second hearing, at which time Plaintiff requested a closed period of disability from November 4, 2015 through August 1, 2019.[1] R. 16. On March 19, 2020, ALJ LaVicka again issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act. R. 16, 80-104, 186-199.

On August 28, 2020, the Appeals Council again vacated the ALJ's decision and remanded the case, finding that an interrogatory was requested and exhibited into the record prior to the

---

[1] "If a claimant was previously disabled, but has since recovered and returned to work, the claimant may allege a closed period of disability to obtain benefits for the time he or she was disabled." *Charlene L. v. Saul*, No. 3:19CV626 (REP), 2021 WL 725822, at *7 (E.D. Va. Feb. 3, 2021), *report and recommendation adopted*, No. 3:19CV626-REP, 2021 WL 725078 (E.D. Va. Feb. 24, 2021). "When a claimant alleges a closed period of disability, 'the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision.'" *Id*. (quoting *Pickett v. Bowen*, 833 F.2d 288, 289 n.1 (11th Cir. 1987)). *See generally* § 22:275, Closed period of disability, 2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:275 (2nd).

hearing by the ALJ, but the expert's interrogatory was not proffered to Plaintiff or her representative for objections or additional questioning. R. 206-211.

A third hearing was scheduled for December 17, 2020, but upon the request of Plaintiff's representative, due to lack of notice that a medical expert was scheduled to testify, a continuance was granted. R. 71-79. On March 15, 2021, a telephonic hearing was held before ALJ Karen B. Kostol. R. 75-76. On March 31, 2021, ALJ Kostol issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act. R. 15-31, 40-70.

The Appeals Council denied Plaintiff's request for review on June 2, 2021, making the ALJ's decision the final decision of the Commissioner. R. 1-6.

On August 4, 2021, Plaintiff, by counsel James T. Carey, filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Kilolo Kijakazi, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). Compl., ECF No. 1. On February 18, 2021, the Commissioner, by counsel Maximillian F. Nogay, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. Answer, ECF No. 12; Admin. R., ECF No. 13.

On November 19, 2021, Plaintiff filed Plaintiff's Motion for Summary Judgment, ECF No. 19, along with Plaintiff's Brief in Support of Motion for Summary Judgment, ECF No. 19-1. On January 19, 2022, Commissioner filed her Motion for Summary Judgment, ECF No. 23, along with a Memorandum in Support of her Motion for Summary Judgment, ECF No. 24.

The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule of

Civil Procedure 9.02(a). Having reviewed the parties' motions and the administrative record, the undersigned now issues the following Report and Recommendation.

## II.  BACKGROUND

In accordance with the Court's Order Directing Filing of Briefs, the parties were required to produce a stipulation of facts in order to provide the Court with a chronology in narrative form of Plaintiff's relevant medical history. ECF No. 14 at 2. The undersigned relies upon those parties' recitation of the facts[2] throughout this report and recommendation but, for the sake of completeness, after considering the record in full, the undersigned will highlight select factual information below.

### A. Personal History

Plaintiff Kristin Melissa Moffat was born on December 29, 1980 and was a younger individual, age thirty-four (34), on the alleged disability onset date of November 4, 2015. R. 29-30. She completed college and worked as a secondary teacher until her onset date. R. 29, 587. Plaintiff resides with her husband and minor child. R. 22, 112, 191. Plaintiff alleges disability for the closed period of November 4, 2015 to August 1, 2019, due to major depressive disorder and generalized anxiety disorder. R. 19. Plaintiff also has the following impairments: status post gastric bypass surgery; obesity; diabetes mellitus, type 2; hypertension; and a history of ovarian cancer. R. 19.  In August 2019, Plaintiff returned to full-time work as a teacher. R. 195.

Claimant has a history of depression and anxiety dating back to adolescence. R. 19. In 2012, well before the relevant time period, Plaintiff was diagnosed with ovarian cancer and had a total hysterectomy. Plaintiff's ovarian cancer exacerbated her depression. R. 905, 907. Plaintiff

---

[2] *See* Pl's Brief Supp. Mot. Summ. J., No. ECF 19-1 at 3-8; Def.'s Brief Supp. Mot. Summ. J., ECF No. 24 at 3-10.

has had no reoccurrence of the cancer and is stable, requiring only routine follow-up. R. 19, 27, 190, 194.

In 2015, Plaintiff established care with Dr. Dana Morton of Cornerstone Care for the purposes of psychiatric medication management without psychotherapy. R. 742-43. Dr. Morton diagnosed Plaintiff with major depressive disorder, recurrent, moderate; generalized anxiety disorder; and inattentive ADHD and prescribed medication for Plaintiff. R. 744-745. Regarding Plaintiff's mental status, Dr. Morton noted that Plaintiff exhibited a cooperative demeanor, appropriate speech, normal consciousness, full orientation, logical thought processes, intact and average thought associations, unremarkable thought content, intact memory, average knowledge, intact abstract thinking and reasoning, fair judgment, reasonable insight, and no evidence of homicidal or suicidal ideation. R. 742-43.

Dr. Morton continued to see Plaintiff, noting similar mental status and improvements in September and December 2015. R. 748, 753, 755-56, 760, 762-763. In February 2016, Dr. Morton noted that Plaintiff had a depressed mood, but otherwise noted general improvement. R. 767. In April 2016, Dr. Morton noted Plaintiff's euthymic mood, but continued improvement. R. 773, 775-776.

In May 2016, Dr. Morton opined that Plaintiff's condition had worsened, but her mental status findings remained unremarkable. R. 868, 871-872. Dr. Morton then changed Plaintiff's medications and noted improvements from July 2016 to October 2016. R. 874, 876, 878-79, 883, 885-86, 889, 892-93, 913, 915-16.

On December 20, 2016, at an appointment establishing care with Cherian John, M.D. to be her primary care physician ("PCP") Plaintiff reported being molested at young age by a family member. R. 962-965. She further stated she had not told her psychiatrist about it. *Id*. Dr. John

encouraged Plaintiff to discuss her abuse history with her psychiatrist. R. 967. Plaintiff's records reflect consistent psychiatric medication management, but Plaintiff consistently refused counseling. R. 25, 27, 945 ("She states that she is not seeing a therapist. She is very reluctant to do so."), 949.

From February 2017 to July 2017, Dr. Morton recorded unremarkable mental status examinations for Plaintiff. R. 919, 927-928, 932, 934-935, 939, 941. In September 2017, Dr. Morton described Plaintiff's problems as "moderate," finding she exhibited a depressed mood and congruent affect, but otherwise noted Plaintiff's normal mental status examination findings. R. 947. In December 2017, Dr. Morton noted Plaintiff's symptoms were relieved with medication and her mood had improved. R. 950, 952. Dr. Morton continued to see Plaintiff from February 2018 onward with unremarkable mental status examination findings throughout. R. 955, 1000-22, 1107, 1112-1113.

In January 2018, Plaintiff underwent a gastric bypass procedure, with reportedly no post-operative issues. R. 26, 189, 193, 968-970.

On July 26, 2018, Plaintiff was evaluated at the University of Pittsburgh Medical Center as a possible candidate for transcranial magnetic stimulation ("TMS") or electroconvulsive therapy ("ECT") treatments. R. 1050-1053. The Final Report concluded that "given her long [history of] depression with recent very limited response to treatments [patient] is a good candidate for a TMS/ECT." R. 1052. The evaluating physician, LalithKumar K. Solai, M.D., noted that Plaintiff appeared "to be more interested in ECT now than TMS" and Plaintiff was "eager to get started very soon[.]" *Id*.

Plaintiff underwent ECT on August 28, 2018, August 30, 2018, September 5, 2018, September 7, 2018, September 11, 2018, September 14, 2018, and September 17, 2018, at Western Psychiatric Institute and Clinic ("WPIC"). R. 1026; 1028.

Plaintiff ceased ECT treatments in the fall of 2018, and reported that after stopping the treatments, her mood improved with an increase in medication and her anxiety was not "generalized, but more situational." R. 1110.

In January 2019, Plaintiff reported increased depression and anxiety after the death of her mother. R. 1104.

## B. Medical Reports and Opinions

### i. Dr. Frank Roman, Ed.D.

On May 24, 2016, state agency psychologist Frank Roman, Ed.D., reviewed the record and opined that Plaintiff's mental impairments caused moderate limitations to her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors. R. 138-139. Dr. Roman remarked that the medical record evidence showed that Plaintiff's symptoms were improving and rating at a moderate level. R. 140. Dr. Roman opined that Plaintiff was "capable of doing more for herself and family based upon [medical record] but is unmotivated and unwilling." R. 140. Dr. Roman concluded his explanation by stating that Plaintiff retained "the capacity for routine work in a low pressure setting with minimal change in routine and little decision making" and Plaintiff is "competent to manage her affairs." R. 140.

### ii. Dr. Saima Noon, M.D.

On May 25, 2016, state agency medical consultant Dr. Saima Noon, M.D., reviewed the record and opined that Plaintiff could perform medium work without postural, manipulative, visual, communicative, or environmental limitations. R. 137, 140-141.

### iii. Dr. John Todd, Ph.D.

On November 11, 2016, state agency psychologist Dr. John Todd, Ph.D. reviewed Plaintiff's updated record and concurred with Dr. Roman's opinion. R. 148, 151-2.

### iv. Dr. Subhash Gajendragadkar, M.D.

On November 10, 2016, state agency physician Subhash Gajendragadkar, M.D., reviewed the updated record and concurred with Dr. Noon's opinion. R 150.

### v. Dr. Cherian John, M.D.

On December 20, 2016, Plaintiff established care with Cherian John, M.D. to be her primary care physician ("PCP") after her prior PCP, Ramesh Thimmiah, M.D., had left. R. 962. In this initial visit, Dr. John noted that Plaintiff "looked very sad," and explained that Plaintiff admitted to "being molested at age 9 by her 11 year old brother . . . did not tell her parents until about 2 years ago . . . states she has not told her psychiatrist[.]" R. 964-965. Dr. John diagnosed Plaintiff with depression, anxiety, history of molestation, fatigue, obesity, obstructive sleep apnea syndrome, non-compliant with CPAP treatment, metabolic syndrome, and ADHD. R. 967. Dr. John's treatment plan included directing Plaintiff to follow up with Dr. John in sixty (60) days, to follow up with her psychiatrist as scheduled, to decrease her caloric intake, and to continue her medicines as prescribed, except for decreasing her Metformin dosage. *Id*. Dr. John noted her discussed binge eating with Plaintiff and encouraged her to discuss her allegations of molestation with her psychiatrist. *Id*.

On the same day, Dr. John wrote a letter reciting that Plaintiff's "past medical history includes Obstructive Sleep Apnea (OSA), Fatigue, Anxiety, Depression, Metabolic Syndrome, Hypertension, Ovarian Cancer with complete hysterectomy and Polycystic Ovarian Syndrome." R. 961. Dr. John further wrote that Plaintiff "suffered from anxiety and depression," including "by her reporting, . . . periods of 'very deep depression.'" *Id*. Dr. John explained "[d]uring her periods of deep depression she is unable to perform even her activities of daily living on her own, because of this, for the past 2 years her mother has lived with her and her family[.]" *Id*. Based upon her Patient Health Questionnaire, Dr. John explained that Plaintiff was "severely depressed" despite her psychiatric care and medication. R. 961. Dr. John concluded by opining "[i]t is unlikely that she can maintain a regular work schedule during this period and during her periods of deep depression she is unable to perform her basic activities of daily living and therefore would be incapable of performing any work-related activity." *Id*.

     *vi.*    *Dr. Dana Morton, M.D.*

On July 14, 2015, psychiatrist Dana Morton, M.D., ("Morton"), of Cornerstone Care in Burgettstown, Pennsylvania saw Plaintiff for a psychiatric diagnostic evaluation with medical services. R. 740-745. Dr. Morton noted that Plaintiff's appearance was "appropriate," her demeanor was "cooperative," her consciousness was "clear" and "alert," and her thought processes were "logical" – however, Plaintiff's mood was "depressed." R. 743. Dr. Morton diagnosed Plaintiff with recurrent, moderate Major Depressive Disorder, Generalized Anxiety Disorder, and ADHD Inattentive. Dr. Morton prescribed medication and ordered a follow up with Plaintiff. *Id*.

On September 1, 2015, Dr. Morton saw Plaintiff for medication management. R. 746-752. During the visit, Morton noted Plaintiff was "improving," her mood was "euthymic" and "symptoms are relieved by counseling, medication, psychiatric care and therapy." R. 746. Dr.

Morton continued to follow up with Plaintiff through December 2015, noting improvements and similar mental status. R. 753, 755-56, 760, 762-63.

In February 2016, Dr. Morton noted Plaintiff was generally improving, though she noted Plaintiff's depressed mood and congruent affect. R. 767. In April 2016, Dr. Morton again noted that Plaintiff continued to improve and exhibited a euthymic mood. R. 773, 775-776.

In May 2016, Dr. Morton remarked that Plaintiff's condition had worsened, but she continued to record unremarkable mental status examination findings, including a euthymic mood and congruent affect. R. 868, 871-72. She again changed Plaintiff's medications R. 874. Dr. Morton noted improvement in July 2016 and continued to note improvements through October 2016. R. 876, 878-79, 883, 885-86, 889, 892-93, 913, 915-16. Dr. Morton described the frequency of Plaintiff's problems as "occasional." *Id*.

On November 15, 2016, Dr. Morton completed a mental residual functioning capacity ("RFC") assessment wherein she reported Plaintiff has recurrent, moderate Major Depressive Disorder and Generalized Anxiety Disorder. R. 899. Morton remarked that Plaintiff had medication treatment "without improvement." *Id*. Morton indicated Plaintiff had moderate functional limitations in the activities of daily living and in maintaining concentration, persistence, or pace. R. 901. Morton indicated Plaintiff had marked limitations in maintaining social functioning and in episodes of decompensation within a twelve-month period, each of at least two weeks duration. *Id*. Morton opined Plaintiff experienced an anxiety-related disorder and complete inability to function independently outside her home, and she would be absent from work more than four days a month. R. 902.

On November 19, 2016, Dr. Morton again met with Plaintiff for medication management and noted Plaintiff was "improving" and her problems were "occasional." R. 919. Morton further

noted "[a]ggravating factors include conflict, not getting wants and stress." *Id*. Dr. Morton recorded similar findings at visits through June 2017. R. 932, 934-35, 939, 941.

On September 15, 2017, Plaintiff again visited Cornerstone Care for medication management without psychotherapy. Plaintiff's symptoms were "moderate" and "weekly since onset." R. 945. Morton made the additional note that Plaintiff "continues to feel that she is unable to work, despite stating that she feels that the [medications] are controlling her anxiety symptoms but she is feeling depressed. She states that she is not seeing a therapist. She is very reluctant to do so." *Id*. Plaintiff was referred to a therapist in Wheeling, West Virginia. *Id*.

On December 11, 2017, at her medication management visit at Cornerstone Care, it was noted Plaintiff's "[s]ymptoms are relieved by medication[.]" R. 955. At a follow-up visit on February 12, 2018, Plaintiff reported her "depression continues to persist, although . . . it may be related to the weather/winter seasons," she "does not feel much purpose in life, as she is not working and does not know her 'place[,]'" she "spends most of her day in bed," and she feels "the Cymbalta [medication] may not be working any longer." *Id*.

On April 9, 2018, Plaintiff reported to Cornerstone Care that she felt "very depressed, no energy. . . . Ha[d] not noticed any improvement this time however." R. 1014.

On February 12, 2018, Plaintiff reported her "depression continues to persist, although . . . it may be related to the weather/winter seasons," she "does not feel much purpose in life, as she is not working and does not know her 'place[,]'" she "spends most of her day in bed," and she feels "the Cymbalta [medication] may not be working any longer." R. 1019.

On May 21, 2018, Plaintiff reported at her visit that her depression was severe for "about three weeks; she is so depressed that she was unable to drive, care for her child, or get out of bed. Discussed ECT as an option for patient; reports she has thought about this and is interested. She

reports that at times in her life, her depression has become so severe that she is almost catatonic. She reports that once when she was younger, she had to be life flighted to the hospital because she was almost catatonic, wouldn't eat or drink in a depressed state. She reports she is 'tired' of trying so many medications and just wants to feel happy again. She hasn't worked for some time because of having to miss days [related to] depression." R.1009. It was ordered that a referral for TMS be faxed to WPIC. R. 1013. It was noted that patient's previous medication failures include Lexapro, Trintellix, Abilify, Amitriptyline, Nortriptyline, Risperdal, Rexulti, Prozac, Zoloft, Methylphenidate, Guanfacine, Effexor, Depakote, Wellbutrin. *Id*. It was noted Plaintiff's depression was "still 7/10 with inability to function well." R 1013.

On July 16, 2018, Plaintiff "reports she is scheduled for intake with WPIC for TMS on 7/26. . . . She feels like she is desperate for something to help. She gets up in the morning to care for her daughter, but then goes back to bed. Doesn't want to do anything, feels worthless. She is hopeful TMS will help, but if it doesn't is willing to try ECT. Reports at one point in her past, Cymbalta mixed with Ritalin was helpful, looking to try something like that again." R. 1003.

Plaintiff had another medication management visit on September 10, 2018 where she reported "she has done 4 ECT treatments and she does not like them. She has been getting 2 per week. She reports having nausea, headaches, and body aches. She gets really emotional after treatments. She decided to continue all medication. She reports that when she first started taking Cotempla, she noticed a 'big difference', but now feels it isn't helping as much." R. 998.

In November 2018, Plaintiff reported that she had stopped ECT treatment because of "her headaches," but since stopping them, her mood improved with an increase in medication and her anxiety was not "generalized, but more situational." R. 1110.

On January 7, 2019, Plaintiff again visited Cornerstone Care for medication management. At the visit, she reported increased depression and anxiety since the unexpected death of her mother. R. 1104. Plaintiff "again" became "upset" that provider was unable to prescribe her benzodiazepines. *Id*.

     vii.    *Dr. Dustin Williams, MA, Ph.D., LPC,[3] LP[4]*

On October 1, 2019, ALJ Jeffrey P. LA Vicka requested that medical expert Dustin Williams, MA, Ph.D., LPC, LP, complete a set of interrogatories, based upon evidence provided, and provide a professional opinion in connection with Plaintiff's Social Security disability claim. R. 1076.

In his Mental Interrogatory Response, completed on October 18, 2019, Dr. Williams opined that Plaintiff's mental limitations caused moderate limitations in her ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. R. 1076. Dr. Williams further opined that Plaintiff's mental impairments would cause moderate limitations in her ability to understand, remember, and carry out both simple and complex instructions and to make judgments on simple and complex work-related decisions and in her ability to interact appropriately with supervisors, coworkers, and the public, as well as her ability to respond to changes in the routine work setting. R. 1083-84. Dr. Williams concluded that Plaintiff's impairments, established by the medical evidence, combined or separately, did not meet or medically equal the criteria for any impairment described in the Listing of Impairments, specifically because Plaintiff has no limitations in the extreme or marked ranges to satisfy the "B" or "C" criteria under Listings 12.04 or 12.06. R. 1079. Dr. Williams opined that "[w]ithout undergoing a formal psychological assessment process with objective assessments the best

---

[3] Licensed Professional Counselor.
[4] Licensed Psychologist. *See* Dr. Williams' credentials at R. 1116- 1125.

estimate of the patient's abilities is that they can perform most simple work tasks without difficulty when sober and free of substances." R. 1082.

On December 11, 2020, Dr. Williams again opined that "[w]ithout undergoing a formal psychological assessment process with objective assessment the best estimate of the patient's abilities is that they can perform most simple work tasks without difficulty." R. 1127.

### viii.   *Dr. Richard Anderson, Ph.D.*

During the March 15, 2021, ALJ hearing, psychologist Richard M. Anderson, Ph.D., testified that the primary diagnosis for consideration is Plaintiff's "major depressive disorder moderate," which would be considered "severe diagnosis." R. 54. However, Dr. Anderson clarified that while he believes the major depressive order to "be considered a severe impairment when it was initially diagnosed in July of 2015," the "diagnosis was never more than moderate depression" and "[t]he mental status exams throughout . . . her treatment by the psychiatrist was basically normal. Symptoms were often described as mild." R. 55.

After considering Listings 12.04 and 12.06, Dr. Anderson testified that Plaintiff's impairments did not singularly or in combination meet any of the listed impairments. R. 55-56. In regard to the B criteria of the Listings, Dr. Anderson testified that Plaintiff experienced "moderate limitations" in her ability to understand, remember, or apply information and in her ability to adapt or manage herself. R. 56. Dr. Anderson further testified he would expect Plaintiff to have "moderate limitations in ability to deal with complex tasks, possibly a limitation to more simple tasks[.]" R. 57. Particularly during her depressive period in 2015, Dr. Anderson would expect Plaintiff to have had "difficulty dealing with changes in job duties." *Id*. Dr. Anderson testified he did not see evidence to support limitations in social interaction, or in concentration, persistence, and pace. R. 56-57.

14

Dr. Anderson noted that Plaintiff had previously been diagnosed with "generalized anxiety disorder" and "ADHD," but he explained that he did not see "a lot of support for [anxiety] in terms of specific symptoms" nor did he see "objective evidence to support" the ADHD diagnoses. R. 55.

When asked if any findings or opinions within the evidence or record conflicted with his opinion, Dr. Anderson cited two contradictory opinions. Dr. Anderson explained that Plaintiff's psychiatrist provided a statement indicating Plaintiff had marked limitations in social interactions and in the ability to adapt, but Dr. Anderson testified that he found no support for these findings within the psychiatrist's treatment notes. R. 57. Further, Dr. Anderson explained that Plaintiff's primary care physician described in his December 2016 notes that Plaintiff's mood was "stable," elaborating that there had "been a lot of improvement." R. 57. Dr. Anderson testified that "really at no time did I see any indication of marked limitations, or even severe impairments." R. 57-58.

### III.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that

meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled

at one of the five steps, the process does not proceed to the next step. *Id*.

## IV.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.  The claimant did not engage in substantial gainful activity from November 4, 2015, through August 1, 2019, the requested closed period (20 C.F.R. § 404.1571 *et seq*.).

3.  During the requested closed period[,] the claimant had the following severe impairments: status/post gastric bypass surgery; obesity; diabetes mellitus, type 2; hypertension; history of ovarian cancer[;] major depressive disorder; and generalized anxiety disorder (20 C.F.R. § 404.1520(c)).

4.  The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 4040, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.  From November 4, 2015 through August 1, 2019, the requested closed period, the claimant had the residual functional capacity to perform light work as defined in 20

16

C.F.R. § 404.1567(b) except with the following limitations: could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; must have avoided concentrated exposure to extreme cold, extreme heat, wetness, and humidity, excessive vibration, irritants (such as fumes, odors, dust, and gases); must have avoided all exposure to any hazards, such as dangerous moving machinery and unprotected heights; was capable of simple, routine, and repetitive tasks, in a low stress job, defined as having only occasional decision making requiring, occasional changes in the work setting and no fast-paced production requirements, such as fast-paced assembly line work or high volume piecemeal quotas; and was capable of no interaction with the general public and occasional interaction with co-workers and supervisors, such as she was capable of working with things rather than people.

6. The claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on December 29, 1980, and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 4040, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, from November 4, 2015, through August 1, 2019 (20 C.F.R. § 404.1520(g)).

R. 15-31.

## V.    DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.*

*v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)).

"The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157, 203 L. Ed. 2d 504 (2019); *see also Sizemore v. Berryhill*, 878 F.3d 72, 80-81 (4th Cir. 2017). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." *Hays*, 907 F.2d at 1456 (citing *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Written Contention of the Parties

Plaintiff, in her Motion for Summary Judgment and Brief in Support thereof, asserts the ALJ erred by failing "to weigh the treating and examining medical opinions in accordance with the regulations, agency authority, and Fourth Circuit precedent." ECF No. 19-1 at 1. Specifically, Plaintiff contends the "treating sources opined that Plaintiff had limitations that were (1) consistent only with a finding of disability and (2) supported by the record." ECF No. 19-1 at 10. Plaintiff further contends that the ALJ did not reasonably or logically reject the limitations opined by treating sources to rely on the opinion of the testifying expert. ECF No. 19-1 at 13.

Defendant, in her Motion for Summary Judgment and Brief in Support thereof, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." Def.'s Motion, ECF No. 23 at 1. Defendant specifically asserts substantial evidence supports the ALJ's evaluation of the opinion evidence, including reasonably discounting the opinions of Dr. Morton and Dr. John and affording great weight to the opinion of Dr. Anderson. ECF No. 24 at 14. Defendant contends that the ALJ provided a comprehensive discussion of the objective evidence, which affords this Court with the opportunity for meaningful judicial review. ECF No. 24 at 19.

### C. Analysis of the Administrative Law Judge's Decision

**1. Substantial evidence supports the ALJ's evaluation of the medical opinions, including affording little weight to Dr. John's opinion, affording some, but not great weight to Dr. Morton's opinion, and granting great weight to the opinion of Dr. Anderson. The ALJ adequately considered the factors provided in 20 CFR § 404.1527, and this Court should defer to her judgment.**

An ALJ must "weigh and evaluate every medical opinion in the record." *Monroe v. Comm'r of Soc. Sec.*, No. 1:14CV48, 2015 WL 4477712, at *7 (N.D.W.Va. July 22, 2015). In evaluating medical opinions, the ALJ must "go through the exercise of carefully balancing the evidence, assigning weights to the competing opinions . . . and explaining the rationale for doing so." *See Ebbert v. Berryhill*, No. 1:17-CV-193, 2018 WL 5904507, at *7 (N.D.W. Va. Sept. 28, 2018), *report and recommendation adopted*, No. 1:17CV193, 2018 WL 5892364 (N.D.W. Va. Nov. 9, 2018) (quoting *Smith v. Barnhart*, 395 F. Supp. 2d 298, 307 (E.D.N.C. 2005)). Careful balancing necessarily requires the ALJ explain why the "medical evidence in the record supports the opinions or how the opinions are consistent with the medical evidence." *Id.* (quoting *Buchanan v. Colvin*, No. 1:14cv209, 2016 WL 485339, at *4 (W.D.N.C. Jan. 19, 2016). Under the applicable

regulation,[5] 20 C.F.R. § 404.1527, the following factors are considered in deciding how to weigh any medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Generally, a treating physician's opinion should be accorded greater weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927 (treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").[6]

However, it is not required that the treating physician's opinion be given controlling weight. *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) ("By negative implication, if a [treating] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.") Specifically, an ALJ "holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter*, 993 F.2d at 35).

---

[5] Claims filed prior to March 27, 2017, such as this one, are still governed by the treating physician rule, codified in the agency's regulations for application to such older claims. 20 C.F.R. § 404.1527. Claims on or after March 27, 2017 are not reviewed under the treating physician rule. Rather, they are reviewed under the rubric set forth at 20 C.F.R. § 404.1520c. Notably, the revised regulations do not eliminate consideration of treating sources altogether. The revisions merely speak to the weight of the evidence to be given to treating sources.

[6] *See supra* n. 5.

The ALJ does not need to specifically list and address each factor in her decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. *Ebbert*, No. 1:17-CV-193, 2018 WL 5904507, at *7 (citing *Pinson v. McMahon*, 3:07-1056, 2009 WL 763553, at *10 (D.S.C. Mar. 19, 2009)) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

In reviewing Plaintiff's case, the ALJ considered the medical opinions of psychologist Dr. Richard Anderson, psychologist Mr. Dustin Williams, state agency psychological consultants Dr. Frank Roman and Dr. John Todd, treating psychiatrist Dr. Dana Morton, treating primary care physician Dr. Cherian John, and state agency physical medical consultants Dr. Subhash Gajendragadkar and Dr. Saima Noon.

Plaintiff argues the ALJ critically erred in her analysis of the medical opinions in this case. ECF No. 19-1 at 9. First, Plaintiff argues the ALJ erred by giving "great weight to the medical expert, [Dr. Anderson], whose testimony reflected a deeply flawed interpretation of the medical evidence." *Id*. at 8. Plaintiff notes that Dr. Anderson never heard Plaintiff's testimony or examined her. *Id*. at 15. Plaintiff further argues the ALJ erred in affording "less weight" to the opinions of "treating sources" Dr. Morton and Dr. John, "who had long treatment relationships with Plaintiff[.]" *Id*. at 9. Specifically, Plaintiff asserts "the ALJ's reasons for rejecting these opinions do not constitute 'good/specific/supported' reasons as required by the regulations; nor is the evidence she relied on to reject the opinions 'contradictory evidence' as required by the Fourth Circuit." *Id*. at 10 (citing SSR 96-2p).

Plaintiff is correct that both Plaintiff's treating psychiatrist Dr. Morton and treating primary care physician Dr. John offered opinions that she could not maintain employment, ECF No. 19-1

at 10; however, the ALJ's reasons for rejecting these opinions are reasonable and supported by substantial evidence.

i.   *Dr. Dana Morton, M.D.*

ALJ Kostol afforded some weight, but not great weight to the opinion expressed by Dr. Morton. The ALJ found that Dr. Morton's opinion of marked mental limitations in social functioning and episodes of decompensation were not fully consistent with the record and explained that while Dr. Morton "set forth the claimant's diagnoses, GAF scores, treatment, and some mental status findings, [Dr. Morton] did not provide sufficient support for such restrictive limitations." R. 28. The ALJ noted that Dr. Morton did not cite to any evidence which would support marked limitations, such as psychosis, delusions, suicidal ideations, repeat emergency room visits, or inpatient care, nor did Dr. Morton provide support for her opinion that claimant would miss more than four days of work per month. *Id*. ALJ Kostol concluded that overall, "the marked mental limitations are inconsistent with the record and unsupported." *Id*.

As Defendant aptly notes, Dr. Morton's opinion regarding Plaintiff's mental limitations were provided in a "fill-in-the-blank and check-the-box style opinion." ECF No. 24 at 16; R. 899-902. The ALJ afforded Dr. Morton's opinion little weight based upon the failure to cite to evidence supporting the form report and checkbox conclusions as well as the fact that the conclusions rendered were inconsistent with the record.

The ALJ's decision to afford Dr. Morton's opinion little weight aligns with a body of case law which provides less weight to form opinions due to their lack of substantive explanation. *See, e.g., Mason v. Shalala,* 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). *Mason* has been cited with approval by a number of district courts within the Fourth Circuit. *See, e.g.*, *Jeffries v. Comm'r of Soc. Sec.*, No. 1:12-CV-162, 2014 WL 1255833, at *12 (N.D.W. Va. Mar. 26, 2014)

(Keeley, J.); *Norman v. Comm'r of Soc. Sec.*, No. 2:14-CV-33, 2014 WL 5365290, at \*27 (N.D.W. Va. Oct. 21, 2014) (Bailey, J.); *Pickering v. Comm'r of Soc. Sec.*, No. 2:13-CV-43, 2014 WL 1761926, at \*13 (N.D.W. Va. Apr. 30, 2014) (Bailey, J.); *Miller v. Colvin*, No. CV 14-29568, 2016 WL 1275053, at \*4 (S.D.W. Va. Mar. 31, 2016); *Wright v. Astrue,* 2013 WL 275993, at \*5 (W.D. Va. Jan. 24, 2013); *McGlothlen v. Astrue,* 2012 WL 3647411, at \*6 (E.D.N.C. Aug. 23, 2012); *Bishop v. Astrue,* 2012 WL 951775, at \*3 n. 5 (D.S.C. Mar. 20, 2012).

Plaintiff argues that Dr. Morton's opinion should be favored as a treating medical source because of her relationship with the Plaintiff. ECF No. 19-1 at 17-18 (citing 20 C.F.R. § 404.1527) ("these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings along or from reports of individual examinations[.]"). However, the ALJ reasonably discounted Dr. Morton's opinion because she did not provide a detailed, longitudinal picture but rather provided a form report which lacked explanation for the determinations that Plaintiff experienced marked limitations or that she would miss more than four days of work in a month.

Further, the undersigned agrees that Dr. Morton's opinion was inconsistent with the record, and further, inconsistent with her own treatment notes. Plaintiff argues "there is no true contradictory evidence from any treating or examining source." ECF No. 19-1 at 23. That is simply incorrect. Dr. Morton's own treatment notes provide persuasive contradictory evidence to her later medical opinion. On numerous occasions, Dr. Morton described Plaintiff's mental status as generally unremarkable, including a cooperative demeanor, appropriate speech, normal consciousness, full orientation, logical thought processes, intact and average thought associations, unremarkable thought content, intact memory, average knowledge, intact abstract thinking and

reasoning, fair judgment, reasonable insight, and no evidence of homicidal or suicidal ideation. *See* R. 742-43, 748, 753, 755-56, 760, 762-763, 767, 773, 775-776, 868, 871-872, 876, 878-79, 883, 885-86, 889, 892-93, 913, 915-16, 919, 927-928, 932, 934-935, 939, 941, 947, 955, 1000-22, 1107, 1112-1113. She noted Plaintiff's condition improvement at various times throughout her treatment within the closed period. R. 876, 878-79, 883, 885-86, 889, 892-93, 913, 915-16, 919,1110.

Generally, "the more consistent an opinion is with the record as a whole, the more weight [an ALJ] will give to that opinion." *See* 20 C.F.R. § 4040.1527(c)(4). The ALJ determined that Dr. Morton's opinion regarding Plaintiff's mental limitations was only somewhat consistent with the record as a whole, so she only afforded it some weight. The undersigned **FINDS** substantial evidence supporting ALJ Kostol's evaluation and weighing of Dr. Morton's opinion, where, as the ALJ articulated, this opinion lacked supportive findings or substantive explanation and where the opinion was inconsistent or contrary to the record.

ii.   *Dr. Cherian John, M.D.*

The ALJ afforded little weight to the opinion expressed in a letter by Dr. John. R. 28. The ALJ explained that Dr. John provided only a "one paragraph narrative of claimant's medical history and a conclusory statement that the claimant is incapable of performing any work-related activity." *Id*. The ALJ further explained that in support of his opinion, Dr. John only listed the claimant's impairments and one test score, a PHQ-9, or Patient Health Questionnaire, indicating severe depression, which are both based upon claimant's subjective reports, rather than Dr. John's objective assessments. *Id*. The ALJ concluded Dr. John's opinion "is not particularly probative in this case because he has not offered any specific functional limitations, but rather offered an opinion that the claimant is disabled[.]" R. 29.

Plaintiff argues that Dr. John should be afforded great deference as a treating physician, but the undersigned would note that Dr. John's letter encompassing his opinion regarding the Plaintiff was written the very same day as Plaintiff's first appointment establishing care with Dr. John. *See* R. 961-962.

Further, Dr. John's opinion letter is undeniably brief and vague. R. 961. In his first paragraph, he relays Ms. Moffat's reported medical history and states, "by her reporting, she has periods of 'very deep depression'[.]" R. 961. In his second paragraph, Dr. John cites to her PHQ-9, then concludes "it is unlikely that she can maintain a regular work schedule during this period and during her periods of deep depression she is unable to perform her basic activities of daily living and therefore would be incapable of performing any work-related activities." R. 961. Dr. John's opinion does not cite any specific, objective findings to support his opinion. It is apparent to the undersigned, as it was apparent to the ALJ, that the opinion rendered by Dr. John was based almost entirely on claimant's subjective complaints and, thus, may be discredited. *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (finding that an ALJ may give lesser weight to a treating physician's opinion that "was based largely upon the claimant's self-reported symptoms."); *Vest v. Astrue*, No. CIV.A. 5:08-00219, 2009 WL 899418, at *10 (S.D.W. Va. Mar. 31, 2009) (upholding ALJ's decision not to accord physician's opinion controlling weight where it was based on subjective reports, not substantiated by physician's treatment and medical findings).

The undersigned **FINDS** the ALJ's decision to afford Dr. John's opinion little weight is proper in accordance with case law and supported by substantial evidence.

### iii.    *Dr. Richard Anderson, Ph.D.*

ALJ Kostol afforded great weight to the testimony of medical expert Dr. Richard Anderson. Dr. Anderson opined that Plaintiff's MDD and GAD "are severe impairments, but that they only caused the claimant moderate mental symptoms and limitations during the relevant time period

and do not meet any listing." R. 27. The ALJ reasoned that Dr. Anderson "supported his opinion with specific citations to the record, noting [Plaintiff's] mental status examinations were essentially normal and her symptoms were often described as mild to moderate. Such an opinion is consistent with the claimant's diagnoses and treatment, her mental status examination findings, and her highest GAF score, all as detailed above." *Id.*

Plaintiff argues that, while consistency is a relevant factor to be consider under 20 C.F.R. § 404.1527, "the conclusion that Dr. Anderson's opinion was consistent with the record is based on review of a highly selective portion of the record." ECF No. 19-1 at 22. Plaintiff asserts that the record shows Plaintiff's depression was intractable and required electroconvulsive therapy. *Id.* Plaintiff argues that there was ambiguity in Dr. Anderson's testimony regarding whether ECT was properly prescribed and whether Plaintiff truly had intractable depression; Plaintiff argues that based on this ambiguity, the ALJ should have afforded Dr Anderson's opinion less weight than she did. *Id.* at 20-21.

Defendant responds by stating that while Dr. Anderson's testimony conceded that ECT treatment is generally considered a treatment of last resort, which may have created some ambiguity, the ALJ explained in her opinion that the ECT treatment was only one aspect of Plaintiff's treatment and overall, the longitudinal record supports that Plaintiff refused counseling, her GAF scores did not correspond to marked limitations, and her mental status examination findings were generally unremarkable. ECF No. 24 at 19 (citing R. 27). Defendant argues substantial evidence supports the ALJ's grant of great weight to Dr. Anderson. *Id.*

The undersigned agrees with the Defendant. The ALJ articulated why she afforded Dr. Anderson's testimony great weight, noting his credentials, his consistency with the Plaintiff's diagnoses and treatment records, and the citations he used to support his findings on the record.

Any ambiguity or contradictions regarding the specifics of the ECT treatment and Dr. Anderson's expertise on said treatment were likewise addressed in the ALJ's opinion. R. 27. After reviewing the ALJ's opinion, the parties' briefs, and the entirety of the record, the undersigned **FINDS** the ALJ decision to afford Dr. Anderson great weight is supported by substantial evidence.

In sum, ALJ Kostol carefully considered the evidence in Plaintiff's record, assigned weight to the competing medical opinions, and thoroughly explained her rationale for doing so. Because the ALJ applied the correct law and her weighing of the medical opinions was supported by substantial evidence, the undersigned recommends that Plaintiff's Motion for Summary Judgment, ECF No. 19, be **DENIED**, and the Defendant's Motion for Summary Judgment, ECF No. 23, be **GRANTED**.

### 2. An ALJ has no duty to recontact any medical sources.

Plaintiff asserts that if "the ALJ had reasonably concerns about the basis of the treating and examining source opinions, she could have re-contacted them . . . for clarification. Indeed, the Agency has established the procedures, and set forth the duty, to allow a curious ALJ to resolve any inconsistency[.]" ECF No. 19-1 at 23.

An ALJ is required to consider all impairments the claimant says they have or about which she receives evidence. 20 C.F.R. §§ 404.1512(a), 416.912(a). The ALJ or Agency "may" recontact a medical source. *See* 20 C.F.R. § 404.1520b(b)(2)(i). However, "[w]hen there are inconsistencies in the evidence that we cannot resolve or when, despite efforts to obtain additional evidence, the evidence is insufficient to determine whether you are disabled, we will make a determination or decision based on the evidence we have." 20 C.F.R. § 404.1520b(3).

The undersigned would note the recontacting of a medical source is discretionary. Here, there was ample evidence in the record regarding Plaintiff's prior medical treatments and

diagnoses and the treating sources' medical opinions. The ALJ had no duty to solicit further information on Plaintiff's behalf. The ALJ's opinion was comprehensive and fully articulated how she weighed and evaluated medical opinions and the extent to which each medical opinion was consistent with the record. The ALJ's decision should not be disturbed where the ALJ, after carefully considering all evidence, exercised her discretion not to recontact physicians but rendered a clear decision supported by substantial evidence.

The undersigned **FINDS** the ALJ did not err by choosing not to recontact any medical sources before she considered the medical opinions, weighed those opinions against the evidence of record, and articulated in her opinion the reasons for affording some medical opinions more weight than others.

### 3. The ALJ's decision, finding that Plaintiff was not disabled and could perform work, is supported by substantial evidence.

Plaintiff argues that it was "unreasonable to conclude, as the ALJ did, that Plaintiff's depression was not severe enough to cause the limitations described by her treating sources. Rather, the only reasonable interpretation of the record is that she had severe intractable depression that did not respond to the typical treatment, necessitating the treatment of last resort, ECT." ECF No. 19-1. Plaintiff specifically argues that the ALJ "cherry picked" evidence that supports a finding of non-disability. ECF No. 19-1.

Defendant argues Plaintiff is mistaken. Defendant notes that the ALJ's single-spaced fifteen-page opinion summarizes "the voluminous record" including Plaintiff's numerous subjective complaints of depression and anxiety, many unremarkable examination findings, and the worsening of Plaintiff's symptoms during certain periods of time. ECF No. 24 at 20. Defendant argues the ALJ is not required to "specifically refer to every piece of evidence in [her] decision." ECF No. 24 at 20 (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)).

Plaintiff relies heavily on Plaintiff's ECT treatments as evidence of Plaintiff's "intractable disability," but as noted by the ALJ in her opinion, while claimant did participate in ECT therapy and had a high GAF, she also refused counseling or psychotherapy and had "essentially normal mental status examinations throughout the relevant time period." R. 27. *See also* R. 24 ("the objective medical evidence shows that [Plaintiff's] symptoms remained at a moderate level during the relevant time period, with only some occasional exacerbations due to stress.").

The record reflects that Plaintiff has "no difficulty cleaning her home," driving, taking her daughter for a play date once a month, attending church, shopping, going to the gym three times a week, watching her diet, or taking her daughter to dance/gymnastics when she felt well enough. R. 24, 26, 191, 196. As previously noted, throughout Plaintiff's treatment, her mental status was noted as unremarkable by her own psychiatrist. The ALJ rendered a detailed opinion which explained why the ECT treatments along did not solely suffice for a finding of disability where the overall objective evidence does not support the alleged intensity and persistence of Plaintiff's symptoms during the relevant time period. Upon review, the undersigned **FINDS** that the ALJ's opinion that Plaintiff was not disabled is supported by substantial evidence and should not be disturbed by this Court.

## VI. RECOMMENDED DECISION

For the reasons articulated above, the undersigned recommends Plaintiff's Motion for Summary Judgment be **DENIED**, ECF No. 19, and Defendant's Motion for Summary Judgment be **GRANTED**, ECF No. 23, the decision of the Commissioner be **AFFIRMED**, and this case be **DISMISSED WITH PREJUDICE**.

The parties shall have **fourteen (14) days** from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and**

**the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge.

Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** 28 U.S.C. §636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to all counsel of record.

Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

**Respectfully submitted May 23, 2022.**

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

30